The Honorable Judges of the United States Court of Appeals in and for the Seventh Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this Honorable Court are admonished to draw near and give their attention as the Court is now sitting. God save the United States and this Honorable Court. And good morning, everyone. Our first case for this morning is Dinerstein v. Google, and I see Mr. Perlstadt and Mr. Rhodes. Can you hear me? Yes, Your Honor. Yes, Your Honor. All right. Thank you, Your Honor. May it please the Court. We allege that the University of Chicago sold medical records to Google without patient consent and without sufficiently redacting them to protect patient privacy. Our complaint raised several claims, but there's three I want to focus on today. Breach of confidence, breach of contract, and tortious interference with contract. But before I get to the merits, I think I need to address standing. Judge Pallmeyer had no trouble finding that we had alleged Article 3 injuries, in fact, and I don't think the standing inquiry should be that complicated, but defendants fight it adamantly. Mr. Polstein, can I ask you a question? I actually have a lot of questions about standing in this case, and my first question is with respect to transunion and the breach of confidence claim. Do you concede that there's no standing on the confidence claim? There's two standing theories. One is a future harm with respect to Google putting in information to determine individuals locations at a certain period in time, and then the second theory I thought was the free text notes theory. So two theories. But after transunion, does the future harm theory survive? I would push back a little bit on that, Your Honor. I don't think this is a risk of harm case. This is a, we allege the disclosure of private information, both the free text notes and the date stamps. And I think the line that transunion draws is a line between disclosure and non-disclosure. In transunion, the court said the injury here, the Article III injury, is the disclosure of credit reports that had this terrorist designation on them. People whose reports were never disseminated did not have standing, and people whose reports were disseminated did have standing. But what the transunion court did not do is it did not go further and say only those people whose reports were disseminated and who were denied credit have the injury. It doesn't, the transunion court basically makes clear that it doesn't matter what the recipient of disclosed information does with that information. It just matters that the private information here was disclosed. And so in transunion makes, I'm sorry? No, go ahead. Go ahead. I was just going to say in transunion clearly states that disclosure of private information is an Article III injury. But where do you, where in your complaint do you allege facts, not conclusions, facts, that private information was disclosed? I went back through the complaint very carefully and even with respect to the free text notes, you've got paragraph 68 and 69 and you've got paragraph 89 and I think paragraph 95. But what are the facts that you allege with respect to disclosure of personal identifying information? Well, we allege that, and I think 92 to 95 are the key paragraphs here, certainly with respect to Mr. Kinnerstein. He alleges that he spent two multi-night stays in the hospital. He alleges that confidential sensitive information was collected about him, including free text notes, including date stamps, and that they were not properly redacted before selling to Google. But isn't that, but wait, that last sentence is a really important sentence, that they were not properly redacted. That's a conclusion. At least I think, isn't that a conclusion, not a fact? Well, it's a factual statement. The statement is they were not redacted. I think it's fair to, when we say free text notes, maybe it's a term of art and maybe it's not clear, but free text notes include things like social history. It includes things like jobs and drug use and prior vacations and recent vacations and sexual histories, things like that. It includes all sorts of private information. It's collected upon admission. It's collected during procedures and examinations. And so I think just saying free text notes includes all of those things. And then to say that they were not sufficiently redacted is a factual statement. Maybe it's true. Maybe it's not. But at the pleading stage, we're entitled to an inference of plausibility. Does Mr. Dinnerstein have his free text notes with respect to his visits at the University of Chicago Hospital? I haven't seen them personally, Your Honor. I haven't seen the free text notes, but we allege that his records contained free text notes and that those were disclosed to the university. And I think those are plausible allegations because as we point to, especially in the reply brief, we point to Dr. Volchenbaum, his talk in the complaint, and we elaborate on that in reply brief where Dr. Volchenbaum says, who again is the Associate Chief Research Informatics Officer at the University of Chicago. He gave this whole speech at a Google conference where he says, redacting free text notes is really hard. We can run it through de-identification software, but it still contains information which is in his words, quote, actually quite identifiable. Man, that's a big leap, isn't it, to say that someone gave a speech that said it's hard to identify. In this particular case, we can, you can plausibly allege that based on that speech, that these free text notes were not sufficiently de-anonymized. I respectfully disagree. I think it's, I think it's very, an allegation that free text notes were collected, that information was collected like all these private facts about people were put into free text notes. And then just to assume that they were run through this de-identification software and that the de-identification software was, was wonderful and, and took out any information which would be identifiable, given that the University of Chicago's own, I would call it an expert, says is a really hard process. I think it's, it's fair to, to read our complaint as alleging that this kind of private information was disclosed. And I think that that gives us standing for the invasion of privacy. Is the private information, Mr. Perlstad, if I could interrupt, I'd like to, as a matter of methodology, address standing claim by claim, because that's the way we usually do it. That's what's required under the doctrine, is that standing has to be assessed by claim and for the kind of relief that's being sought. You're seeking every form of relief in the book, so I'm not so concerned about that part of the equation, but I am concerned about a claim by claim standing analysis. So perhaps you could proceed in that way. Sure. Well, I would say that I think the, the invasion of privacy, which is what we've been talking about, I think supports every claim. I think it supports the common law tort claim. I think it supports the breach of contract claim. Actually, that's, that's not right, because your contract claim is, is conceptually distinct from your tort claim for invasion of private privacy. Your Consumer Fraud Act claim under the Illinois Consumer Fraud Act, and so forth. There's conceptual distinctions between each of those claims, and we need to keep them separate. So what is the injury for the contract claim? What's the injury for the ICFA claim? What's the injury for the tort claim for invasion of medical privacy? Sure, Your Honor. Again, I'll just push back a little bit. The harm he suffered was an invasion of privacy. You're just going to have to accept my premise and answer the question. Okay. So let me, let me talk about the contract claim. With respect to standing, I think the breach of contract alone is sufficient to support standing. I think that this court made that clear in JP Morgan, and I don't think any of the Supreme Court's recent standing cases do anything to undermine that. Well, Justice Thomas wouldn't, wouldn't agree with that, would he? I mean, Justice Thomas's dissent is pretty clear as to how he read the majority's opinion in TransUnion. In terms of the breach, in terms of a breach of contract? Yeah, yes, in terms of the injury. I don't, I don't think. It's a very sweeping decision. Sure, but it's, it's still a statutory decision. All of, Spokio, Tolle, TransUnion, they're all about standing. They're all about separation of powers, and, and they, the point in those cases, too, on standing, is that one way we determine whether there's standing is we look to common law claims. And so I just, I don't think they undermine JP Morgan. But let me move on to, to pecuniary art, because that, I think that certainly supports our breach of contract claim. And there's, there's two forms of, of monetary damages that we allege here for breach of contract. The first is sort of the benefit of the bargain. We allege that we, we paid for treatment and confidentiality, and that all we got was treatment without confidentiality. And so we're entitled to the loss benefit of the bargain. We're entitled to, to a restitution for partial performance. We paid for many things. We only, we didn't get everything, so we're entitled to our money back minus the part that we received. We don't have any quarrel with the treatment we received, but we, we allege that we didn't receive the privacy that was promised. But what are your factual allegations in the complaint that what you paid for was worth less than what you got? I think, I think that's paragraph. Your premiums, you got less than what you paid, your premiums paid for in terms of medical services. In paragraph one, in paragraph 112, we allege that the value of healthcare services without adequate privacy protections is worth substantially less than the value of such services with adequate protections. Well, that's a conclusion. Are there, are there some plausible factual allegations to back that up? I, I think the, I don't know how much more we need to allege at the pleading stage. We, we, that is a factual statement. It may be true, it may be not true, but it's, it's, it's in the same vein as, as Aquedots in terms of its, well, Aquedots was a product defect case. You're not alleging that anything about the medical services was defective. This is not a product, this is not a product liability case. So we've only used that overpayment theory or accepted that overpayment theory at the pleading stage for purposes of product liability cases. Well, the Eighth Circuit has adopted this, exactly this argument in the GameStop case where, where the, the, there was a, a digital magazine subscription with a confidentiality promise and it was alleged that the, that the digital magazine subscription was provided, but not the confidentiality and the Eighth Circuit found that sufficient to support overpayment damages, both for standing and, and to state a claim under, for, for breach of contract. The other, the other damages theory that we allege is the, is kind of the, the, the lost value of the, of the information, kind of this conversion theory that, that Mr. Dinerstein's information has value, that, that the university was able to sell it and Google is further trying to exploit the monetary value from that. And so we're entitled to disgorgement of that sort of value. And I think, I think the best case for that is, is SNAP versus United States, where the Supreme Court found that disgorgement was an appropriate remedy where a government agent violated a confidentiality agreement and wrote a book and he was forced to disgorge those profits. The, the point of a disgorgement remedy here is to prevent opportunistic breach where compensatory damages are going to be inadequate. So normally you can breach and pay damages. If the university had promised Mr. Dinerstein a widget worth a hundred dollars and it decides later, oh, well, we can use that widget more profitably elsewhere. So we won't give him the widget, but we'll just give him a hundred dollars. Normally compensatory damages are fine in that where privacy is hard to value, it's impossible to substitute. So as in SNAP, a disgorgement remedy is, is what's imposed to kind of prevent those opportunistic breaches. And that's, that's, that comes from the third restatement of unjust enrichment and restitution. And the third circuit endorsed that in Montgomery Bridles. And like I said, SNAP versus United States endorsed that theory as well. If I could clarify, Mr. Perlstadt, your, your contract claim is premised on HIPAA, the promise to comply with HIPAA and the promise to comply with the privacy notice. If, if I understand correctly, is there more to it than that? Or is that the, the crux of the contract claim? It's based on the authorization agreement, just to be technical here. It's based, there is an authorization agreement sign in which the state and federal law and comply with its notice of privacy practices. And then in the notice of privacy practices, the university says, we won't sell your information without your authorization first. And we alleged that that was breached. We also talk about the HIPAA breaches and the Illinois state law breaches in the briefs, but, but yes, our complaint is the main breach of contract allegation as judge Pallmeyer found is that they promised not to sell our data without talking to us first, and they didn't do that. And Pallmeyer, judge Pallmeyer found that that was, that that was a breach. She just found that, that we didn't allege economic damages, which we think is an error. Right. So it's not, it's not a general, you know, violation of privacy or disclosure of the private confidential medical records. It's keyed to the requirements of HIPAA and HIPAA has a safe harbor for research and has a definition of what identifying information and has a definition of what it means to sell this information and so forth. So we have to, we have to evaluate as judge Pallmeyer did the contract claim through the lens of the statutory requirements, because it's a kind of a bootstrapping contract claim, as I understand it. Is that a fair evaluation of it? That's mostly fair, but again, with the sale, the notice of private, I think that's true with respect to the, to the promises to comply with state and federal law. But, but I would, I think that the, that the sale allegation, the notice of privacy practices separately says, we won't sell your information without talking to you first. And so I think, I'm not sure you need to evaluate that through the lens of HIPAA. But regardless, I think as we talked about in our briefs, I think even looking at this through the lens of HIPAA, I don't think it was, it was fair to dismiss this plan because I, I don't think the, I don't think everything needed to assert those exceptions. The general HIPAA rule is a rule of non-disclosure, and then there's some exceptions. But I don't think the, I don't think you can read the complaint to set out everything needed to state, to state those objections. With your court's permission, I'd just like to request the remainder of my time for questions. We have two Mr. Rhodes, arguing for the defendants. So I'm not sure which of you is going first. That would be me, Your Honor. All right. May it please the court, Parker Rhodes for the University Appellees. I'll just go ahead and begin with the standing questions that this court spent some time discussing with my friend on the other side. With respect to Dinerstein's claim for breach of medical confidentiality. First, I'd like to emphasize that I don't think there's really any analytical difference here between Dinerstein's allegations with respect to the data that the university shared broadly, and with respect to the free text notes. In both instances, what Dinerstein alleges was that that data was, quote, not sufficiently anonymized, end quote, at A67. And of course, that's simply a conclusion as to what degree of anonymization is sufficient. Now, Dinerstein asserts that what he plausibly alleges is that Google could look at this in other words, could identify this information as belonging to Dinerstein himself. But there's simply no facts in the complaint to support that. And on the contrary, what the documents attached to the complaint show is that the free text notes, like all of the other data that the university shared, it goes through a de-identification process. So that's at A111 in the joint appendix, where the data use agreement between the university and Google explicitly says that the free text data, quote, has gone through CRI's de-identification process to remove identifiers except for dates of service. So even assuming that Google had some capability to re-identify any of this data as belonging to Dinerstein, of course, Google explicitly and contractually promised that it would not, in fact, attempt to associate any of this information with any particular individual. Given that contractual promise, Dinerstein simply hasn't shown any non-speculative risk that he would suffer any concrete harm from the university sharing that information. What about the dates of service component of this? Aren't the dates of service protected and required to be redacted under HIPAA if there's a disclosure? Your Honor, the fact that the dates of service were included makes this individually protected information under HIPAA, but it doesn't preclude any kind of sharing under HIPAA. So what HIPAA permits is the sharing of individually protected information like the information here in circumstances either in which that research is approved by an institutional review board, and the allegations in Dinerstein's complaint show that this research was, in fact, approved by the University of Chicago's research board. Alternatively, HIPAA also permits the sharing of individually identified protected information in the form of what's called a limited data set, and that limited data set can include dates of service. It can't include names or addresses or email addresses, but that data set can include dates of service, and that kind of sharing of information is permitted under HIPAA when it's shared subject to a data use agreement like the one between the University of Chicago and Google here. So Judge Pallmeyer simply misunderstood that component of the claim under HIPAA? No, Your Honor. So Judge Pallmeyer agreed with the university that there was no breach of HIPAA plausibly alleged by Dinerstein with respect to either the institutional review board exception or the limited data set exception. Judge Pallmeyer erred in finding that there was a breach here on the theory that the university had sold this found was she found that Judge Dinerstein had plausibly alleged a sale of information from the university to Google, and a sale of information isn't permitted under any circumstances without explicit consent. We argue that that conclusion was erroneous because what occurred here can't plausibly be described as a sale either under normal English usage or under the HIPAA university statute. So Judge Pallmeyer is not aware of any of the interactions between the university and Google, and those only occurred after Mr. Dinerstein was treated. So the data use agreement only came into existence and the joint research project between the university and Google only came into existence after Dinerstein was treated. So we are to make nothing of the fact that the patient is unaware of the subsequent contract between the hospital facility and Google. That has no impact at all on the litigation in your view. That's correct, Your Honor. That has no influence on the litigation, and in fact, the university itself wasn't aware that this research project would be happening until the research project actually came into existence. What Mr. Dinerstein did agree to in his agreement, the A93 in the record, is that his medical information may be used and shared for research, and then it goes on to say that it's approved by the university's institutional review board, etc. And so Dinerstein was fully aware when he entered the hospital for medical services that the medical information he provided could in fact be used and shared for research. And frankly, that largely undercuts his allegations that he simply wouldn't have received medical service if he had known that his information could be shared with others, because it said in the exact agreement that he relies on, and he admitted and acknowledged in the agreement that he relies on, that this kind of sharing could in fact take place. With respect to standing for the breach of contract claim, unless the court has further questions about standing for the breach of medical confidentiality claim, I'd just briefly say that I think the Supreme Court's decision in TransUnion lays forth a clear rule, no concrete harm, no standing. And that rule should apply here in precisely the same way that it applies in the context of a statutory cause of action. With respect to the two theories of concrete harm. Before you leave that subject, Mr. Rhodes, so your position is that the TransUnion decision is essentially trans-substantive. It applies to all common law claims as well, such as breach of contract, all tort claims. And that all federal courts that have entertained breach of contract claims without an independent concrete showing of a contract injury over and above the contract breach would be pretty substantial, would it not? Well, Your Honor, we submit that the class of cases in which a plaintiff comes into court alleging a breach of contract with no concrete harm to follow is actually a fairly small, if not non-existent class of cases other than this one. I mean, in most cases, what a contract plaintiff seeks is damages that stem from the breach of contract itself. They want to be paid the benefit of their bargain, the amount that they lost from the breach. And when the plaintiff receives damages, that makes clear that the plaintiff did in fact suffer the concrete harm that was at issue. It's only in the rare case like this one where a plaintiff really doesn't have any plausible showing of actual damages from the breach itself in which this rule would come into play. Right, but the understanding at contract law has always been that the victim of a breach of contract is entitled to a legal remedy for that breach in court subject to the provision of proof of what the compensatory damages are. But it's never been thought of as a jurisdictional requirement to plead an injury beyond the breach. Well, Your Honor, I certainly grant that this isn't a topic that has often been discussed in the case law in the past, but I think the Supreme Court's decisions on this topic are clear. They don't draw any distinction between statutory claims and contract claims with respect to the Article III requirements. And in fact, the Thole decision explicitly says that the cause of action does not affect the standing analysis. And of course, Justice Thomas's dissent in the TransUnion case likewise says that what the majority has held is that an injury in law is not sufficient to state Article III standing. Instead, an injury in fact is required. I will just note, by the way, Your Honor, that under Illinois law, in fact, as we've made clear in our briefs, actual damage is an element of a breach of contract claim. And so in Illinois, on the merits, a plaintiff does, in fact, have to plead some actual damage in order to have a valid breach of contract claim. Now, it may well be that if the plaintiff can't prove the extent of that actual damage, the plaintiff can instead recover nominal damages. But there does have to be some showing of actual damage in order to state a valid breach of contract claim in Illinois. In any event, Your Honor, on the merits of that— But the rule of nominal damages is not just a sufficiency of the proof rule. It's a substantive rule that a breach of contract victim gets nominal damages in the discretion of the court once the compensation, if it's proved. But if it can't, if the damages can't be proved with reasonable certainty, then the award reverts to the availability of nominal damages. I don't think I disagree with Your Honor in the way that you've just framed it. But I think that the key point is that in order to show the breach of contract in the first instance, in order to show an actionable breach, under Illinois law, the plaintiff has to show some actual damage, not just a violation of the terms of the contract. And that's clear from this court's decision in the TIS case, where this court explicitly said, under Illinois law, merely— It's important not to read those statements of the elements of the claim too expansively to jurisdictionalize them. The elements of a claim are just that. They're the factual elements that the plaintiff has to prove in order to recover. But let's not jurisdictionalize them. I think that would be an overreading of the Supreme Court's decisions. That's correct, Your Honor, and I don't disagree with that. So the question for Article III jurisdiction is separate from the question of what a plaintiff is required to state an Illinois breach of contract claim on the merits. The point I'm making is just that it happens to be true under Illinois law that in order to state a claim on the merits, the plaintiff has to show actual damage. With respect to the Article III question, it's a separate discussion as to whether Article III likewise requires some showing of actual damage or concrete harm. We submit that the TransUnion case resolves that question and says that concrete harm is, in fact, required. And I would also point to this Court's decision in the SILHA case in which this Court was presented with a breach of contract claim and found no standing because there was no showing of concrete harm. Now, there were a number of— That decision, that opinion didn't analyze it precisely that way. We're supposed to be analyzing these standing questions claim by claim. That didn't happen in SILHA. It's not really happening here in this case either. I mean, there was exhaustive briefing in this case, but it didn't fit within the normal standing methodology. I don't disagree with Your Honor that the SILHA Court didn't explicitly claim by claim resolve the standing inquiry. My point in citing SILHA was just to note that the outcome in that case would have had to have been different if, in fact, a mere allegation of a violation of contract were sufficient to show standing. But just to briefly go claim by claim because I agree with Your Honor that it's important to analyze standing on a claim by claim basis. With respect to the breach of medical confidentiality claim, we submit that standing there is insufficient because there's been no concrete invasion of Diane Ersten's privacy simply from the disclosure in a joint research project of information that didn't include any direct identifiers and in which Google explicitly agreed that it would not attempt to re-identify any of that information. With respect to the breach of contract claim, we submit that the simple showing of a violation of the contract is not enough to create articles of standing and that the overpayment and loss of economic value theories on which Diane Ersten relies are implausible for all of the reasons that this Court put forward in the Lourdes and Remigius cases. Again, his allegation that his economic value somehow, that the economic value of his information was somehow diminished by this research project is purely conclusive and he doesn't cite any facts to back it up. And moreover, it's important to note that under Illinois law, the economic value of a hospital record, the property right in the hospital record itself belongs to the hospital, not to the patient. And Diane Ersten doesn't make any attempt to refute that in his reply brief and this Court recognized that fact in Young. Even if there were some economic value here, that value belonged to the university and not to Diane Ersten, and in any event, he hasn't plausibly alleged facts showing how that economic value was decreased. With respect to his overpayment theory, likewise, Diane Ersten admits that he has no quarrel with the medical treatment that he received. He paid for medical treatment and he received medical treatment. The fact that he was unhappy with the privacy practices that were associated with that is exactly the same argument that this we just note that in addition to all of the jurisdictional problems with standing with respect to Diane Ersten's claims, his claims also fail on the merits for all the reasons that we've discussed in our briefs. As to his breach of medical confidentiality claim, it's not the place of federal courts be engaging in adventurous new decisions and recognizing new state court law claims that the state courts themselves have never recognized. And with respect to the merits of his breach of contract claim, for the reasons in our briefs, there was no actual breach here. The university is an academic research institution that cares deeply about privacy of its patients, and in this case, they complied with their obligations and protected that privacy appropriately. If there are no questions from the court, we ask the court to affirm. Thank you. Mr. Michael Rhodes. Please, the court, and good morning, Your Honors. Let me pivot just if I may to the merits briefly. There are two claims that lay against Google. The second claim is a tortious interference with contract, and we argue, and we argued below, and the court agreed with us that the two predicate acts, one, you have to show under Illinois law that the underlying contract was in fact breached, and we submit that it wasn't. And number two, you have to show that Google had an intent to induce the university to breach its contract with the patient. And under the totality of circumstances present here, where the parties took pains to comply with applicable law, namely with regard to the HIPAA exceptions of a limited data set, with regard to the IRB or Institutional Review Board process that my colleague, Mr. Rhodes, already alluded to, and the commitments in the contract, one, by the university that it had all rights to provide this information with all direct identifiers removed, and secondly, the Google contractual commitment that it would not in any way, shape, or form re-identify. We submit that that tort doesn't lie. The other tort was sort of an evolution of the original claim, which was an intrusion upon seclusion common law claim. You'll recall on the record that the court below gave the plaintiff leave to amend, and they did not take the leave to amend up, and I would argue that procedurally it's infirm for them now to try to transmogrify that original claim into some different claim that's not really in any operative pleading. And then last, your honors, with respect to the issue of standing, I think of it this way. There are two types of harm, and I want to go back to what Judge Kirsch said at the very outset. I always think of it as can we differentiate between what has in fact happened versus what might happen in the future, and if we scour the complaint, we will not see anything with regard to information in terms of what has happened. What we know is that there was an attempt by these two parties to responsibly engage in medical research under the strictures and permission sets of HIPAA and all their laws, entered into a formal data use agreement to memorialize their commitments and promises. The information that was transferred was in fact stripped of direct identifiers, so nothing has happened at this point to re-identify the plaintiff. Indeed, the program has been dead for about two years, and but for this litigation and the holds that attach to litigation, the data would have been long discarded. And secondly, so we were left with what might happen in the future, and I think the best articulation of the plaintiff's position is found on page five of the responding brief on appeal. They identify three potential sources of data, the free text notes, the dates, as well as the geolocation of provision of medical services on page five. And what they're saying in effect is that if we take the totality of what I'm going to refer to as the metadata about Mr. Dinerstein, even though there is no identifying information, at some unknown point in the future, for some unspecified reason, it might be theoretically possible for Google to in fact use that metadata to reconstitute his identity from the information where the direct identifiers were stripped out. All right, Mr. Rose, before we get too much further down that road with the limited time you have left, Mr. Perlstead said he's not relying on that theory anymore in his opening argument. He's, the future, risk of future harm is, has just been withdrawn as a possible theory of harm here. And I acknowledge that, Your Honor. I would suggest to you that if his final written word on the matter was to the contrary, and I think what he's faced with is if he conceded that this is really, as it actually is, as alleged in the complaint, as set forth on page five of the responding brief, the last word on appeal, that this is about what might happen in the future, he realizes that he's out of luck. And that's what this case is about. Because there's not a single allegation of fact in the complaint that Google has tried to reidentify him, is likely to reidentify him, that that is imminent. There's no manifestation of an intent to do so. And I would submit to the court that the responsible actions of these two parties suggest just the contrary. They're trying to do everything possible to comply with HIPAA. And how would we infer an intent to do that which is different than what they actually did? All right. And with that, I will submit unless the court has any other questions for me. All right. Thank you very much. Mr. Perlstadt. You're still on mute, Mr. Perlstadt. I apologize, Your Honor. Thank you. I'd like to get at this idea that, first of all, I want to make clear I'm not conceding that there's, I'm not conceding any of our theories. What I was trying to make clear is that I don't think this is a risk of future harm case. I think the disclosure has happened. And the question is, is the information disclosed? Mr. Perlstadt, I'm going to have to get you to either concede it or not concede it, so we know what you're actually relying on here. About two-thirds of this complaint has to do with this theory that big bad Google is going to re-identify you and the other members of the plaintiff class in a way that causes you harm. I don't want to concede that because we do allege that, I don't think the re-identification allegations are necessary, but we do allege them. If you look at paragraph 6 and paragraph 55, we talk about, we allege that Google's DeepMind technology allows it to find connections between medical records and other information that Google has. We allege that competitors in this space like Facebook have tried to do the exact same thing. So I think we do plausibly allege that Google did that. I don't want to concede that, but the focus I do think, I think our stronger argument, I'll concede that our argument is stronger on the free text notes. And again, to the extent that Mr. Harker-Rhodes and Mr. Mike Rhodes are saying things like the records didn't include direct identifiers or were in fact stripped of direct identifiers, those are, they're fighting the allegations. We allege that they were not. I think it's fair to say that free text notes contain private information. So they are relying on this idea that the de-identification, to the extent it even happened, but that the records were de-identified was sufficient. But we point to University of Chicago research informatics officers who say that's really hard. It's not very successful. Do they say with respect to these, with any records that you point to in this case? Or is that just sort of a suggestion that de-identifying free text notes is difficult to do? It's the latter. It's, we don't cite Mr. Dinnerstein's records in particular, but I think it's a fair inference in our favor that free text notes contain this kind of private information and that these, the de-identification software to the extent it's applied is not sufficient. And I think one more point on the re-identification point, if the records contained things like social security number or email or address or home address, that would be identifying information. We wouldn't have to further allege that someone at Google looked up who that social security number belongs to or who that email address belongs to. And so I think this whole re-identification idea is sort of a red herring. These things were disclosed to Google. We allege that Google has this deep mind technology that can do it, but Google also disclosed this stuff to its employees. At A111, it says we're going to share this information with our software engineers, our product managers, and our quantitative analysts. But Mr. Perlstein, what information was disclosed that HIPAA prohibits disclosure of? Everything was redacted in accordance with HIPAA, with the possible exception of dates of service. I'm not sure that that's true. Things like in the reply brief, the free text notes that Dr. Bolchenbaum points to, it could be things like this guy had an amputation, this guy had seven kids, this guy lived in a town. Those are things that... What part of HIPAA prohibits disclosure of that for research purposes? The claim key is off of HIPAA. Well, HIPAA prohibits a sale without authorization regardless if it's a sale for research or if it's a limited data set. I'm going to separate the sale aspect of this from the disclosure aspect of this, the disclosure without appropriate redaction, because you've alleged in a conclusory way that there's a HIPAA violation here because the records weren't sufficiently anonymized as required under HIPAA, except that the contract says otherwise and you attach the contract to the complaint. So we have to reconcile the conclusory allegation in the complaint about insufficient anonymization with what the data use agreement actually says. So maybe you can thread that needle for me. Well, the limited data set and the research exceptions still have all sorts of details in them. And we talked about this a little bit in our brief. And I don't think you can draw those conclusions from... What about that violates HIPAA? It violates HIPAA if things were disclosed without... For the research exception, an institutional research board has to approve these things, but they have to get certain documentation and they have to go through certain procedures. And there's nothing in the agreement that suggests that that happened. But have you plausibly alleged that it did not? I think we plausibly alleged that medical information was disclosed, and I don't think there's enough in the complaint to say that those exceptions were satisfied. All right. Thank you. Thanks to all counsel. The case is taken under advice.